IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

BRENDA CALVERT,
     Plaintiff,

vs.                            Case No.: 3:11cv620/LAC/EMT

MICHAEL J. ASTRUE,
Commissioner of the Social Security Administration,
     Defendant.
_____/

## REPORT AND RECOMMENDATION

     This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. § 401, *et seq.*  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34.

     Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

I.    PROCEDURAL HISTORY

     On June 9, 2008, Plaintiff filed an application for DIB and alleged therein disability beginning June 2, 2008 (tr. 8).[1]  Her application was denied initially and on reconsideration, and Plaintiff then requested a hearing before an administrative law judge ("ALJ").  A hearing was held

---

[1] All references to "tr." refer to the transcript of Social Security Administration record filed on February 28, 2012 (doc. 14).  Moreover, the page numbers refer to those found on the lower right-hand corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system or any other number that may appear.

on July 15, 2010, and on August 18, 2010, the ALJ issued a decision in which he found Plaintiff "not disabled," as defined under the Act, at any time through the date of his decision (tr. 8–24). On October 27, 2011, the Appeals Council denied Plaintiff's request for review (tr. 1). Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court. Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007). This appeal followed.

## II. FINDINGS OF THE ALJ

In his written decision dated August 18, 2010, the ALJ made the following findings relevant to the issues raised in this appeal (*see* tr. 8–24):

1) Plaintiff meets the insured status requirements of the Act through December 31, 2013.[2]

2) Plaintiff has not engaged in substantial gainful activity since the alleged onset date.

3) Plaintiff's severe impairments include lumbar spondylosis, mild bilateral carpal tunnel syndrome, anxiety, major depressive disorder, and chronic pain, but she has no impairment or combination of impairments that meets or medically equals a listed impairment.

4) Plaintiff has the residual functional capacity ("RFC") to perform light work,[3] except she must avoid working at unprotected heights. She has no mental limitations in her ability to perform unskilled work activities but has moderate limitations in her ability to perform semi-skilled work activity; to interact with members of the general public, co-workers and supervisors; and to respond appropriately to routine changes in a normal, routine work setting.

---

[2] Thus, the time frame most relevant to this appeal is June 2, 2008 (date of alleged onset) to August 18, 2010 (date of ALJ's opinion), even though Plaintiff is insured for DIB purposes through December 2013.

[3] Light work is defined in 20 C.F.R. § 404.1567(b) as follows:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

5)      Plaintiff can perform her past relevant work as an administrative assistant/general clerk because such does work not require the performance of work-related activities precluded by her RFC; alternatively, Plaintiff can perform other work existing in the national economy.  Plaintiff, therefore, has not been under a disability from June 2, 2008, through August 18, 2010.

## III.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result

in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id*. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g), the Commissioner analyzes a disability claim in five steps:

1.     If the claimant is performing substantial gainful activity, she is not disabled.

2.     If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3.     If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.     If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5.     Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her RFC and vocational factors, she is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must then prove she cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

## IV.   PLAINTIFF'S PERSONAL, EMPLOYMENT AND MEDICAL HISTORY

### A.   Personal and Employment History

Plaintiff, who was forty-nine years of age at the time of her hearing before the ALJ in July 2010 (tr. 43), attended regular classes in high school and obtained a General Equivalency Diploma (tr. 43, 200). She worked as a CNA/home health aide for Covenant Hospice ("CH") from 1992 through 2002. Her duties included lifting patients, bathing patients, and otherwise attending to patients' needs (tr. 46–47). In 2002 Plaintiff injured her back on the job, and due to resulting physical limitations her duties at CH were modified to those of an administrative assistant (tr. 44–45). Her job duties, as modified, included filing, answering the phone, and performing other clerical tasks (*id.*). Plaintiff was terminated or "forced out" by CH on June 2, 2008 (the date she alleges she became disabled), because her position was eliminated (tr. 48, 191). She testified she would have continued working at CH had she not been forced out (tr. 66). Plaintiff also testified that after she was terminated by CH she applied for and received unemployment compensation benefits (through the spring of 2010) (tr. 48–49). She explained that in order to receive those benefits she was required to search for jobs, and that she did so by applying for jobs with nursing homes, convenience stores, and grocery stores (tr. 49). She testified she felt capable of performing a job that would permit her to freely alternate between sitting and standing (*id.*). She also testified that she continued to apply for jobs even after her unemployment benefits were discontinued, including as recently as at or near the time of her hearing before the ALJ (*see* tr. 50).

At the time of Plaintiff's hearing she lived with her boyfriend and engaged in daily activities such as playing on the computer, "getting around the house," and walking in the yard (tr. 58, 60). She testified, however, that she could not shop, walk more than 100 yards without a break, or perform household chores (except to fold laundry) (tr. 59–60).[4] She further testified she had back pain that worsened with standing, sitting, walking or bending and improved with lying down, which she did (or took naps) three to four times a day (tr. 58–59). Plaintiff also reported that she was depressed, which affected her ability to concentrate, and that since September 2006 she experienced

---

[4] On a disability report form, dated August 6, 2008, Plaintiff indicated she could take care of her personal needs, such as bathing, caring for her hair and dressing, and she could do laundry "a little over time," some housekeeping but not sweeping or mopping, and yard work or gardening if she worked slowly (tr. 204). Plaintiff also stated she could not "sit, stand, walk, bend twist, lift, or carry for more than [twenty minutes] at a time" (tr. 205), although she also reported traveling by car to and from a physician's office that is nearly fifty miles from her home (*see* tr. 51).

anxiety attacks once or twice a week, each of ten to twenty minutes duration (tr. 62; *see also* tr. 207 (Plaintiff's report in August 2008 that she experienced anxiety attacks every two weeks)).

      B.     Medical History

      <u>Treating or Examining Physicians or Evaluators (pre-June 2, 2008, the alleged onset date)</u>

      The medical record in this case consists of 510 pages (*see* tr. 255–765), approximately 300 of which concern treatment Plaintiff received prior to the date she alleges she became disabled, including treatment for the injury that occurred at CH in November 2002 (*see* tr. 255–536, 545–51). The earlier treatment records, however, are generally relevant to the issues raised in this appeal and thus are included in the summary of Plaintiff's medical history. The earlier records reflect that Plaintiff sustained a back injury on November 15, 2002, while performing her duties as a CNA/home health aide for CH (tr. 12). She received physical therapy from November 27, 2002, through December 3, 2002 (*see* tr. 271, 288). On December 20, 2002, a physician (whose name is not legible) returned Plaintiff to work with modified duties (i.e., no bending, stooping, heavy lifting, or pushing or pulling more than fifteen to twenty pounds) (tr. 289). And on January 28, 2003, Plaintiff was released to full duty work by Gregg A. Alexander, M.D., an orthopedist (*see* tr. 12, 290; *see also* tr. 306 (another physician's release to full duty work on December 17, 2002)). Dr. Alexander opined that Plaintiff would reach maximum medical improvement ("MMI") in two months (or in or about March 2003), and he assessed a 6% whole person permanent impairment rating (*see* tr. 311).

      On May 8, 2003, Sean Fitzgerald, M.D., a neurosurgeon, examined Plaintiff in connection with her complaints of back pain and left leg pain reportedly caused by her work injury (tr. 12, 275). He also reviewed the results of a recent magnetic resonance imaging scan ("MRI"), which appears to have been obtained on January 6, 2003 (*id.*; *see also* tr. 402). Dr. Fitzgerald noted that the MRI revealed a "small bulge to the annulus in the foramen on the left," which did not deviate but did approximate the L5 nerve root on exit (tr. 275). Dr. Fitzgerald opined that surgical intervention and epidural injections were unnecessary because no radicular component was present (*id.*). On June 19, 2003, Dr. Fitzgerald opined that Plaintiff could return to light duty work (tr. 273–74, 386–91).

      In June of 2003, a licensed occupational therapist evaluated Plaintiff and concluded that Plaintiff could perform jobs requiring sedentary to light physical exertion (tr. 384–85).

On July 2, 2003, Plaintiff presented to Michael X. Rohan, M.D., an orthopedist (tr. 394). She reported she was unhappy with Dr. Fitzgerald's conclusions, and she requested another lumbar MRI (*see id.*). Dr. Rohan ordered an MRI and opined that Plaintiff could continue working in a "light" capacity (*see* tr. 394–97). The MRI, obtained on July 23, 2003, revealed "[d]egenerative changes primarily at L4-5 with mild-to-moderate left annular bulging with contained protrusion producing mild-to-moderate left foraminal narrowing and borderline canal narrowing," other changes that were "minimal-to-mild and of questionable significance," and straightening of the spine, consistent with strain or spasm (tr. 295, 416).

In July 2003, Plaintiff presented to Thomas J. Derbes, M.D., with complaints of pain in the low back, leg, and hip, and she returned in August 2003 with complaints pain in the low back (tr. 326). Dr. Derbes subsequently administered lumbar epidural steroid injections ("ESIs") at L5 on the left and bilateral lumbar facet joint injections at L4-5 and L5-S1 (tr. 324–25, 414).

Plaintiff began seeing David Evans, M.D., a pain management physician, on September 23, 2004 (tr. 285, 493, 495). She complained of low back pain, left leg pain, and bilateral hip pain as a result of her work-related injury (tr. 497). Following a physical examination that revealed some relatively minor abnormalities (*see* tr. 503–04), Dr. Evans prescribed medications, advised Plaintiff to quit smoking (she was then smoking more than one pack of cigarettes per day (doc. 499)), and suggested that Plaintiff return in four weeks (tr. 505). Plaintiff followed up in October and November 2004, and Dr. Evans' treatment notes are essentially the same, although—following the November visit—Dr. Evans advised Plaintiff to return in ten weeks (tr. 490–92 493–94). Plaintiff, however, returned in mid-December following a "slip and fall" incident (tr. 488). Dr. Evans continued Plaintiff on her medications, after noting Plaintiff's report that the medications decreased her pain, caused no side effects, and improved her quality of life and daily activities (tr. 486). He advised Plaintiff to return in twelve weeks (*id.*).

In a letter dated February 24, 2004, Dr. Fitzgerald stated that he agreed with Dr. Alexander's opinions regarding Plaintiff's MMI (that is, that Plaintiff had reached MMI in or about March 2003) and whole person permanent impairment rating (that is, 6%) as to her work-related injury (tr. 381;

*see also* tr. 311). He also stated he had reviewed Plaintiff's MRI results and reiterated his opinion that surgical intervention was unnecessary (*see* tr. 381).[5]

In June 2004, Plaintiff returned to Dr. Derbes and reported that medication had improved her ability to function and caused no side effects (tr. 361, 363, 407, 411). She also underwent another lumbar MRI in June 2004, which revealed degenerative disc disease at L4-5 and L5-SI, with minimal posterior spondylosis; minimal annular bulging toward the left at L4-5, with minimal bilateral foraminal narrowing and borderline canal narrowing; minimal broad-based annular bulging at L5-S1, more prominent on the right, with mild right and minimal left foraminal narrowing; and minimal facet hypertrophy at L5-S1, without canal stenosis (tr. 400). In July 2004, Plaintiff again reported improved function with the use of medications and no significant side-effects (tr. 405–06).

On October 23, 2004, Plaintiff underwent a functional capacity evaluation ("FCE") at Dr. Evans' request (tr. 320). Overall, the FCE revealed no significant physical findings. The evaluator (Roy Nash, a licensed occupational therapist) opined that Plaintiff could perform work at sedentary to light exertional levels, and he released Plaintiff to her current work at CH (which, he estimated, involved lifting fifteen to twenty pounds occasionally and ten pounds frequently) (*see* tr. 320–23).

Plaintiff obtained another MRI of the lumbar spine on January 3, 2005, which revealed mild degenerative disc disease at L1-2, L4-5, and L5-SI, with disc desiccation and slight circumferential disc bulges but no disc protrusion, central canal stenosis, or foraminal narrowing throughout the lumbar spine (tr. 426).

Plaintiff returned to Dr. Evans in June of 2005, at which time he added ESIs to Plaintiff's treatment regimen (tr. 477). When Plaintiff returned in August 2005, she reported that her pain had improved, she described her pain as "mild," and she rated her pain as a two on a ten-point scale ("2/10") (tr. 474). Dr. Evans again advised Plaintiff to cease smoking and, as he had done before, recommended a home exercise program (tr. 475; *see also, e.g.*, tr. 480, 483, 486). Likewise, in October 2005, Plaintiff rated her pain as a 2/10, stated her pain was "better," and noted her pain was relieved with injections and medication management (tr. 471). In November 2005, Plaintiff again reported pain relief with Dr. Evans' treatment regimen, although she rated her pain as a 4/10 (tr. 339). Plaintiff returned on other occasions in 2005 and 2006, and Dr. Evans' records, although

---

[5] In May 2008, Dr. Fitzgerald confirmed his earlier opinions (*see* tr. 392).

partially illegible, generally reflect continued successful pain management with medication and/or lumbar ESIs (*see, e.g.*, tr. 339, 341, 342, 344).

In October 2006, the workers' compensation insurance carrier declined to approve Dr. Evans' request for additional lumbar ESIs, based on its determination that ESIs were not medically necessary due to the lack of any nerve root impingement or central stenosis (tr. 278–83).

After reporting pain in her hands and arms to Dr. Evans, Plaintiff underwent a nerve conduction study and was subsequently diagnosed with carpal tunnel syndrome ("CTS") in May 2006 (*see* tr. 457, 455).[6] Plaintiff underwent bilateral carpal tunnel release surgery in December of 2006, after which her symptoms improved "considerably" (*see* tr. 285).

In or about February 2007, R. Barry, Lurate, M.D., an orthopedist, conducted an independent medical evaluation in connection with Plaintiff's work-related injury (*see* tr. 285). Dr. Lurate assessed status post carpal tunnel release, doing well; chronic low back pain; obesity; tobacco dependance, resolved; and history of multiple arthralgias, etiology unclear (*id.*).

On April 11, 2007, Plaintiff underwent another MRI upon referral by Dr. Evans (tr. 292). The MRI revealed multilevel spondylosis, but no evidence of a herniated disc, central canal stenosis, or neural foraminal compromise (tr. 293). On May 14, 2007, Plaintiff—who had last seen Dr. Alexander in January 2003—returned to see him with complaints of low back pain and bilateral leg pain (tr. 433). Dr. Alexander examined Plaintiff, reviewed her MRIs, and diagnosed history of two prior injuries (*id.*). He continued to opine that Plaintiff had a 6% whole person permanent rating and that she had reached MMI as of April 1, 2003, for the November 2002 work injury (*id.*). He also noted that Plaintiff's condition had not changed significantly since he last saw her, and he recommended that Plaintiff continue treatment with Dr. Evans—which treatment included ESIs and medications—and noted that the treatment seemed to be working and keeping her productive (tr. 434). Finally, Dr. Alexander opined that Plaintiff's work status remained "full duty in regard to her usual occupation," that is, "working in medical records at Covenant Hospice" (*id.*).

Lumbar imaging obtained on June 1, 2007, revealed minor lower lumbar spondylosis and facet degenerative changes at L5-S1 (tr. 312).

---

[6] In April of 2006, Plaintiff asked Dr. Evans to write a letter stating that her CTS "was work related because she had been doing a lot of lifting," but Dr. Evans declined to do so because he was not certain that the CTS was related to Plaintiff's work (tr. 285).

Plaintiff returned to Dr. Evans in July 2007 (tr. 348). She reported that the "epidurals and medical management" had decreased her pain, improved her quality of life, improved her activities of daily living, and caused no side effects (tr. 348, 351). A physical examination was essentially normal (*see* tr. 350–51).

On September 26, 2007, W.R. McArthur, M.D., an orthopedist, examined Plaintiff in connection with her work-related injury, after reviewing records and deposition testimony from various treating and examining sources (*see* tr. 284). Dr. McArthur noted that Plaintiff was wearing a cast brace on her left foot from a recent surgery and that her gait was slightly antalgic "but basically normal" (tr. 286). She displayed tenderness in the lower lumbar area and buttocks, although she could fully flex, extend, and touch the floor with her hands (*id.*). She also had full range of motion of the cervical spine with no tenderness (*id.*). Examination of the upper extremities, including Plaintiff's hands, yielded normal results, and examination of the lower extremities revealed full range of motion of the hips, although some movements produced low back discomfort (*id.*). Straight leg raising tests ("SLRs") were negative (*id.*). Dr. McArthur assessed bilateral CTS with good surgical results; chronic low back syndrome, probably secondary to lumbar spondylosis; minimal obesity; and chronic tobacco use (although Dr. Lurate assessed "tobacco dependence, resolved" in early 2007, Plaintiff reported to Dr. McArthur that she smoked one-half to one pack of cigarettes each day, which likely explains the different diagnoses) (*see* tr. 286)) (tr. 287).

Plaintiff received treatment in 2007 (and thereafter) from Mark Akerson, M.D., a family physician with Panhandle Family Care. His records reflect diagnoses of acute bronchitis, anxiety, shoulder pain, hypersomnia, sleeping difficulty, weakness, acute sinusitis, allergic rhinitis and cellulitis (*see, e.g.*, tr. 547, 548, 549, 554, 704, 743).

On October 22, 2007, Plaintiff underwent a second FCE at Dr. Evans' request (tr. 763). Overall, the FCE revealed no significant physical findings, and the evaluator opined that Plaintiff could perform work at sedentary to light exertional levels (*see* tr. 764).

Plaintiff returned to Dr. Evans in January 2008, with complaints of back pain, leg pain, and numbness and tingling in the legs and feet, worse on the left (tr. 508). A physical examination revealed full strength and normal muscle bulk in the lower extremities, tenderness in the spine, and an antalgic gait (favoring the right) (tr. 510). Dr. Evans—after noting Plaintiff's report that lumbar

ESIs "helped her with her ability to perform her activities of daily living, reduced her pain medication requirements, and overall have improved her quality of life"—recommended that Plaintiff undergo additional ESIs (tr. 508). Plaintiff agreed and resumed ESIs on January 10, 2008 (*id.*). Additionally, relevant to one of the issues raised by Plaintiff in this appeal, Dr. Evans observed no psychiatric abnormalities (tr. 509). At a follow-up appointment in late January 2008, Plaintiff reported that the ESIs had helped her back and leg pain (tr. 513 (again, no psychiatric abnormalities were present)). Plaintiff returned in February 2008 with complaints of low back pain, and Dr. Evans continued her medications and recommended conservative measures for the pain, such as stretching, using hot moist packs, and undergoing massage therapy (tr. 337–38).

Treating or Examining Physicians/Psychologists (near and after June 2, 2008, the alleged onset date)

The remainder of Dr. Evans' treatment records from 2008 are in most respects the same as his earlier records and generally reflect continued medication management and the occasional administration of ESIs (*see, e.g.*, tr. 529, 533, 536). Notably, in July 2008 Plaintiff rated her pain as a 2/10 and stated that the ESIs provided two months of pain relief (tr. 538).[7]

On October 18, 2008, Adam Berliner, D.O., conducted a consultative examination related to Plaintiff's complaints of bilateral hip pain and constant low back pain (*see* tr. 558). His examination revealed normal ranges of motion in all areas tested, including the cervical spine, lumbar spine, shoulders, elbows, wrists, hands (including the thumbs and fingers), hips, knees, and ankles (tr. 557). Plaintiff's spine was somewhat tender to palpation at the lumbosacral junction and mildly tender at the lumbar paraspinals (tr. 560). Additionally, manual muscle testing was full (i.e., 5/5) bilaterally in the upper and lower extremities; sensation was intact to light touch bilaterally; SLRs were negative; and Plaintiff could tandem walk, heel and toe walk, and squat and rise from a squatted position without difficulty or clumsiness (*id.*). Finally, a neurological examination revealed that Plaintiff was alert and oriented times four (*id.*). Dr. Berliner assessed lumbar spondylosis and bilateral lumbar radiculopathy (*id.*).

---

[7] Approximately one month later, on August 5, 2008, Plaintiff reported that she was staying with her daughter because her daughter underwent surgery, and Plaintiff had to take care of her daughter's baby (*see* tr. 589).

On November 3, 2008, at the request of the Social Security Administration, Plaintiff underwent a consultative psychological evaluation by George L. Horvat, Ph.D. (tr. 562). Dr. Horvat generally observed that Plaintiff's grooming and hygiene were adequate, and her gait and posture were normal, but her "facial expression was depressed," and her motor activity was agitated as her legs were constantly bouncing and she had tremors (*id.*). Plaintiff stated she had no history of mental health treatment (*id.*). She reported experiencing panic attacks one to two times a month, as well as physical problems and constant pain (tr. 562–63). Examination revealed that Plaintiff was alert and oriented times four, her memory and speech flow were normal, and her thought content was appropriate, but her "attention was distractible" and anxiety interfered with her ability to concentrate (tr. 563–64). Her mood and affect were depressed, but she displayed no signs of hallucinations, illogical organization, or below-average intelligence or fund of knowledge (*id.*). Further, her abstraction, judgment and decision-making were normal (tr. 564). Dr. Horvat assessed adjustment disorder with depressed mood, anxiety disorder with panic attacks, and pain disorder (*id.*). He also assessed a Global Assessment ("GAF") score of 65 (tr. 564).[8] Dr. Horvat opined that if Plaintiff was physically able to work, there were no psychological reasons she could not work (tr. 564).

On April 6, 2009, Plaintiff underwent an evaluation by psychiatrist John Laubenthal, M.D., in connection with her workers' compensation claim or, more specifically, an evaluation of her reported depression and its possible relation to her on-the-job injury (tr. 759). Dr. Laubenthal noted he had reviewed numerous records, including records from Drs. Rohan, Fitzgerald, Evans and Akerson, as well as multiple MRI reports (*id.*). He then interviewed Plaintiff. She reported some depression but denied experiencing hallucinations, delusions, or symptoms of mania or hypomania, although she endorsed some symptoms consistent with attention deficit disorder ("ADD") or attention deficit hyperactivity disorder ("ADHD") (tr. 760–61). Plaintiff also endorsed numerous symptoms of depression, including difficulty falling asleep, decreased appetite, weight gain, limited interest, tearful episodes, feelings of hopelessness and helplessness, and suicidal ideation with no intent, which prompted Dr. Laubenthal to conclude that Plaintiff had "at least a moderate to

---

[8] A GAF score between 61 and 70 reflects mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, with some meaningful interpersonal relationships. Diagnostic and Statistical Manual of Mental Disorders 30–32 (4th ed. 1994) (*see also* tr. 564).

significant degree of depression" (tr. 760). Additionally, Plaintiff described fleeting suicidal thoughts but no intent or plan (tr. 761). Dr. Laubenthal described Plaintiff's mood as depressed and noted that her affect was generally reactive but somewhat blunted and dysphoric (*id.*). He also observed that Plaintiff's attention, memory and concentration were grossly intact; her thought processes were goal directed; and she displayed no evidence of a formal thought disorder or cognitive dysfunction (*id.*). In relevant part, Dr. Laubenthal assessed mood disorder with depressive features secondary to chronic pain and related disability; anxiety disorder due to chronic pain and related disability; possibility of ADD or ADHD, unrelated to her work injury; chronic lower back, hip and lower extremity pain; and history of sleep apnea, untreated (*id.*). He also assessed a GAF score of 60–70 (*id.*).[9]

On May 7, 2009, Dr. Akerson completed forms titled Sedentary Requirements Checklist ("SRC"), Clinical Assessment of Pain ("CAP"), and Absences From Work ("AFW") (tr. 754–57). On the SRC, which lists a series of "yes or no" questions, he opined that Plaintiff could lift five pounds on a repetitive basis and walk short distances, but she could not perform any other work activity listed on the form (that is, according to Dr. Akerson's "no" answers, she could not utilize both hands in the performance of fine manipulation, sustain activity at a pace and with the attention to task as would be required in the competitive workplace, lift and carry ten pounds, sit up to six hours in a normal position, stand up to two hours in an eight-hour workday, or attend any employment for eight hours a day, five days a week) (tr. 754). On the CAP, which contains three questions and offers four preprinted possible answers for each question, Dr. Akerson indicated: (1) in response to the first question, that Plaintiff's pain "is present to such an extent as to be distracting to adequate performance of daily activities or work" (answer "C"); (2) in response to the second question, that physical activity such as walking, standing, bending, stooping or moving her extremities, would increase her pain "to such an extent that bed rest and/or medication [would be] necessary" (answer "D"); and (3) in response to the third question, that "drug side effects can be expected to be severe and to limit effectiveness . . ." (answer "C") (tr. 755–56). On the AFW, Dr. Akerson selected an answer indicating that Plaintiff would miss work "<u>about three times a month</u>"

---

[9] As previously noted, a GAF score between 61 and 70 reflects mild symptoms. <u>Diagnostic and Statistical Manual of Mental Disorders</u> 30–32 (4th ed. 1994). A score between 51 and 60 reflects moderate symptoms. *Id.*

due to her impairments or related treatment, and he identified the impairments to which he referred as "chronic fatigue" and "lumbar disk disease" (tr. 757) (emphasis added). On December 1, 2009, Dr. Akerson completed another set of the forms (tr. 688–91). He selected the same answers on the SRC (*compare* tr. 688 *with* tr. 628). On the CAP, he selected the same answers to the first and third questions, but he lessened the impact of physical activities on Plaintiff's pain by selecting answer "C" in response to the second question and indicating that physical activity will increase Plaintiff's "pain to such a degree as to cause distraction from task or total abandonment of task" (he previously selected option "D," which states Plaintiff would need bed rest due to pain) (tr. 689). And on the AFW, Dr. Akerson selected an option indicating that Plaintiff would miss work more than three times a month (*see* tr. 690). Dr. Akerson completed a third set of the forms on July 7, 2010. He reached the same conclusions as before on the SRC, with two exceptions: he now opined that Plaintiff could utilize both hands for fine manipulation (he previously opined she could not), and he opined that Plaintiff could not lift five pounds on a repetitive basis (he previously opined she could) (*see* tr. 749). On the CAP, Dr. Akerson selected option "D" in response to all three questions, thereby indicating—essentially—that Plaintiff is precluded from all work due to pain (*see* tr. 750–51). Finally, on the AFW, he opined that Plaintiff would miss more than three days of work a month (tr. 752).

Plaintiff continued seeing Dr. Evans in 2009, during which (1) her treatment regimen remained essentially the same (e.g., ESIs, medications) (*see, e.g.*, tr. 593–600, 631, 635, 638); (2) the regimen continued to reasonably control Plaintiff's symptoms with no adverse side effects (*see, e.g.*, tr. 631 (post-ESI pain rated as 2/10), tr. 640 (post-ESI pain rates as 0/10), tr. 642 (treatment noted to improve Plaintiff's quality of life and increase ability to perform daily activities), tr. 653 (pain described as "mild" and rated as a 3/10), tr. 657 (no adverse side effects)[10]); and (3) her physical examinations yielded essentially the same, unremarkable results as before (*see, e.g.*, tr. 598, 643, 655–56). Likewise, Dr. Evans' observations as to Plaintiff's mental/psychiatric status remained essentially the same (*see, e.g.*, tr. 598, 635, 643, 655–57), although in June, July and September

---

[10] One treatment record, dated September 28, 2009, notes that Plaintiff previously experienced some daytime drowsiness, but her medications were apparently adjusted to eliminate this problem (*see* Tr. 632).

2009 he did note depressive symptoms, Plaintiff's report of increasing depression, and/or Plaintiff's request for a referral to a psychologist or psychiatrist (tr. 632, 634, 642, 649).

Also in 2009, Plaintiff underwent an evaluation by psychiatrist Ann McDowell, M.D., in connection with her workers' compensation claim (tr. 677). Plaintiff presented on June 23, 2009, with complaints of depression and stated she was "bothered" because she had been fired and was having financial problems; she also stated that her live-in boyfriend had been fired that morning and his firing was causing additional stress (*id.*). Plaintiff reported decreased "frustration tolerance, energy and concentration" and stated she felt guilty, worthless, hopeless, and helpless (*id.*). Plaintiff further stated she had no medical problems other than pain, which was eased "for a while" with ESIs (*id.*). Plaintiff reported smoking up to two packs of cigarettes per day and, with regard to daily activities, she noted that she "loved" yard work, plants, and flowers (tr. 677–78, 684). She also stated that her "daytime activities" during the week included picking up and babysitting her nieces, aged thirteen and nine (tr. 686). Dr. McDowell's examination revealed that Plaintiff was alert and oriented times four, her articulation and judgment were fair, her fund knowledge was good, and her rate of thinking and content of thoughts were normal (tr. 678). She could perform abstract reasoning "fairly well" and computation in a normal manner (*id.*). Plaintiff had no loose associations, suicidal or homicidal ideation, obsessions, phobias or delusions, and her immediate, recent and remote memory were intact (*id.*). Plaintiff described her mood as depressed, and Dr. McDowell noted that Plaintiff's affect was sad (*id.*). Dr. McDowell diagnosed major depressive disorder, recurrent, moderate and hypersomnia with sleep apnea, unspecified, with severe excessive daytime somnolence (*see* tr. 678, 16). Dr. McDowell noted that Plaintiff was already taking Pristiq 50 mg, which she increased to 100 mg, and she advised Plaintiff to return in three weeks (tr. 678).

Plaintiff returned to Dr. McDowell on three additional occasions in 2009 (in July, September and October) (*see* tr. 671, 665, 659, respectively). In July, Plaintiff reported that her functioning and "nerves" were better with the medication; she also noted she tolerated the medication "well" (tr. 672, 674). Plaintiff reported some generalized anxiety but no panic attacks (tr. 672). Dr. McDowell assessed the same diagnoses and made no changes to Plaintiff's medication (tr. 673). In September Plaintiff reported that some symptoms were worse than before (*see, e.g.*, tr. 665–66), but she reported no generalized anxiety and no panic attacks (tr. 666). Dr. McDowell continued to prescribe

Pristiq 100 mg, assessed the same diagnoses, and advised Plaintiff that she need not return for six weeks (tr. 668). The October 2009 treatment notes are basically the same (*see* tr. 659–63).

Plaintiff occasionally returned to Dr. Evans in 2010. His treatment notes are essentially the same as before (*see* tr. 693–697). One note, from March of 2010, reflects Plaintiff's report that she was satisfied with her treatment plan and desired no change (tr. 697).

Plaintiff returned to Dr. McDowell four times in 2010. Plaintiff reported no panic attacks (tr. 730, 724, 718, 712). Additionally, Plaintiff's medication (i.e., Pristiq 100mg) and psychiatric diagnoses remained the same (*see* tr. 731–32 (January); tr. 725–26 (February); tr. 719–20 (March); tr. 713–14 (May)), although—based on Plaintiff's report of pain—Dr. McDowell added a medical diagnosis of chronic pain (*see, e.g.*, tr. 714). In May 2010, Plaintiff told Dr. McDowell that she had twin, four-year-old grandchildren that she cared for but that she "didn't do much else" (tr. 712). Following the May 2010 visit, Dr. McDowell advised Plaintiff to return in three months (tr. 714).

On July 6, 2010, Dr. McDowell completed a Mental Medical Source Statement as to Plaintiff's mental RFC, as well as an AFW (tr. 735–37). In relevant part, Dr. McDowell opined that Plaintiff had moderate restrictions in activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; and three episodes of decompensation, "each of extended duration, which cause exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation, with an average of 3 episodes in a year or 1 every 4 months, lasting for two weeks" (tr. 735–36). Dr. McDowell also opined that—on or after June 23, 2009—Plaintiff had moderate or marked functional limitations in her ability to perform certain work-related duties, such as understanding instructions, responding appropriately to supervisors and co-workers or customary work pressures, and performing simple or repetitive tasks (tr. 736–37). On the AFW Dr. McDowell opined that Plaintiff would be expected to be absent from work as a result of her impairments or related treatment more than three times per month, and she explained that the impairments to which she referred were Plaintiff's physical impairments (*see* tr. 738). Finally, she noted that Plaintiff denied any medication side effects (tr. 737).

Non-Examining Physicians/Psychologists/Experts

On November 6, 2008, David Guttman, M.D., evaluated Plaintiff's physical capacities and opined that Plaintiff could perform work at a medium level of exertion (*see* tr. 566–73; *see also* 20 C.F.R. § 404.1567(c)). He noted that Plaintiff's "benign" physical examinations were inconsistent with, or did not fully support, her subjective complaints (*see* tr. 571).

On December 2, 2008, Thomas Conger, Ph.D., completed a Psychiatric Review Technique form ("PRTF") (tr. 574–87). He evaluated Plaintiff's psychiatric condition under Section (or "Listing") 12.04 of 20 C.F.R. Part 404, Subpart P, Appendix 1 (Affective Disorders) (tr. 574). Dr. Conger opined that Plaintiff's condition—adjustment disorder with mixed emotional features—did not satisfy the diagnostic criteria of Listing 12.04 (tr. 577, 585). He also opined that as a result of Plaintiff's disorder, she would have no restrictions in activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace; and no episodes of deterioration or decompensation (tr. 584). In summary, Dr. Conger stated:

> [Plaintiff] is limited by her physical condition and pain to some extent but she acknowledges the mental ability to perform a wide range of [activities of daily living] within her physical restrictions. Although she may experience some depression and/or anxiety at times, she remains fully functional from a mental perspective. She is able to relate in a socially appropriate manner and also displays an overall adequate Mental Status. Based on the totality of evidence, she appears to be primarily limited by her physical difficulties and there is no indication of a severe mental impairment at this time.

(tr. 586).

On March 4, 2009, John A. Dawson, M.D., evaluated Plaintiff's physical capacities and opined that Plaintiff could perform work at a light level of exertion (*see* tr. 601–08; *see also* 20 C.F.R. § 404.1567(b)). As did Dr. Guttman, Dr. Dawson concluded that Plaintiff's subjective complaints are not fully credible, noting in part that the complaints are inconsistent with the results of Plaintiff's MRIs and physical examinations (*see* tr. 602–03, 606).

On March 17, 2009, James L. Meyers, Psy.D., completed a PRTF (tr. 609–22). He evaluated Plaintiff's psychiatric conditions under Listing 12.04 and Listing 12.06 (Anxiety-Related Disorders) (tr. 609). Dr. Meyers opined that Plaintiff's conditions—adjustment disorder with depressed mood and anxiety disorder with panic attacks—did not satisfy the diagnostic criteria of either listing (tr. 612, 614, 620). He also opined that as a result of Plaintiff's disorders, she would have the same

restrictions as those imposed by Dr. Conger, with one exception, that is, that she would have mild restrictions in activities of daily living (as opposed to none) (tr. 619).

Testimony of Anthony Francis, M.D.

At Plaintiff's hearing, the ALJ solicited testimony from Dr. Francis, an orthopedist and medical expert (*see* tr. 28–29). Dr. Francis first noted he had reviewed Plaintiff's file and indicated that his testimony would focus on those records that postdate Plaintiff's alleged disability onset date (tr. 30). In pertinent part, Dr. Francis testified that Dr. Berliner's examination in October 2008 "showed no physical findings" (*id.*). He also discussed the RFC assessments of Dr. Guttman and Dr. Dawson, which reflect that Plaintiff could perform work at medium or light levels of exertion, and the opinions rendered by Dr. Akerson on the SRCs, CAPs, and AFWs; he also noted the lack of any MRIs during the time frame relevant to this appeal (*see* tr. 30–31, 34–35). Dr. Francis then testified that Dr. Akerson's opinions on the SRCs, CAPs, and AFWs are inconsistent with his treatment records and that Dr. Akerson "offer[ed] no rationale or explanation" for the opinions (tr. 37–38). Dr. Francis also opined that the most recent MRI revealed "fairly minimal" findings, and that the physical findings of record, including "normal neurological findings in the lower extremities," do not support the diagnosis of radiculopathy and thus the diagnosis was likely based on Plaintiff's subjective complaints (tr. 31–32, 36, 40). Dr. Francis explained that normally a diagnosis of radiculopathy is based upon positive SLRs, decreased sensation to pin prick, loss of muscle strength and reflex, and/or other factors that do not appear in Plaintiff's records (tr. 36–37, 40–41). He further opined that Plaintiff's conditions do not meet or equal the criteria of a listed impairment and that objective testing showed that Plaintiff's CTS was mild (tr. 40–41). Finally, Dr. Francis testified that he concurred with the opinions of Dr. Dawson, which equate to finding that Plaintiff is capable of performing work at a light exertional level, with only one exception, namely, that Plaintiff should be restricted from working at unprotected heights (*id.*).

V.    DISCUSSION

Plaintiff raises numerous issues in this appeal, some of which overlap and some of which are confusing. The issues appear to be the following. The ALJ erred: (1) by failing to accord proper weight—or properly discount—the opinions of Dr. Akerson, Dr. Evans, and Dr. McDowell (doc. 20 at 20–27); (2) in determining Plaintiff's RFC (*id.* at 27–33); (3) in concluding at step four that

Plaintiff could return to her job as an administrative assistant and in concluding, alternatively at step five, that she could perform other available work (*id.* at 27–32); and (4) in evaluating Plaintiff's subjective complaints of pain and other symptoms (*id.* at 33–35).[11] The Commissioner contends the ALJ properly evaluated the opinions of Plaintiff's physicians, as well as her subjective complaints, and properly determined her RFC (*see* doc. 23). He also generally contends that the ALJ considered Plaintiff's claim for DIB in accordance with applicable statutes and regulations, and further, that his final decision denying Plaintiff's claim is supported by substantial evidence on the record as a whole and should be affirmed (*id.*).

A.      Opinions of Plaintiff's Treating Physicians

Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. *See* Lewis, 125 F.3d at 1439–41; Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991); Sabo v. Chater, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d). "'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." Phillips v. Barnhart, 357 F.3d 1232, 1240–41 (11th Cir. 2004) (citation omitted). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See* Edwards, 937 F.2d 580 (finding that the ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

However, if a treating physician's opinion on the nature and severity of a claimant's impairments is well supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2).

---

[11] Plaintiff's brief, at thirty-five pages, far exceeds the limit of twenty-five pages set by this court in its scheduling order (doc. 15). Moreover, the brief is at times repetitive, and the claims are not clearly and concisely set forth therein, which has resulted in this court devoting an inordinate amount to this case and issuing an inordinately lengthy Report.

When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical issues at issue; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d).  Generally, a treating physician's opinion is entitled to more weight than a consulting physician's opinion.  *See* Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir. 1984); *see also* 20 C.F.R. § 404.1527(d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 404.1527(e).   The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether Plaintiff meets a listed impairment, a claimant's RFC (*see* 20 C.F.R. §§ 404.1545, 404.1546), or the application of vocational factors, because those ultimate determinations are the province of the Commissioner. 20 C.F.R. § 404.1527(e).

Dr. Akerson

As discussed in detail *supra*, Dr. Akerson filled out SRCs, CAPs, and AFWs, on which he selected preprinted answers to various questions regarding Plaintiff's functional abilities, pain, and expected absences from work.  The ALJ gave little weight to his selections on these forms (tr. 18).  The ALJ explained that although Dr. Akerson is a treating physician, he is a family physician who mainly treated Plaintiff for a variety of "routine illnesses"—such as bronchitis, sleeping difficulties, sinusitis, allergic rhinitis, and cellulitis—not for her lumbar condition, yet he based his disabling opinions on her lumbar condition and pain (*see* tr. 16–17).  The ALJ's explanation is accurate, as Plaintiff admitted during her testimony that Dr. Akerson did not treat her for her back, and Dr. Akerson indicated that his opinions were largely based on Plaintiff's lumbar condition or related pain (tr. 20, 56–57; *see also, e.g.*, tr. 752, 757).[12]  Moreover, the record reflects that numerous

---

[12] Plaintiff was primarily treated for her back by Dr. Evans during the time frame relevant to his appeal, and his treatment is discussed *infra*.

orthopedists saw Plaintiff for her back, including Dr. Rohan, Dr. Alexander, Dr. Lurate and Dr. McArthur, as well as a neurosurgeon, Dr. Fitzgerald and, further, that none of these specialists opined that Plaintiff suffered from a disabling lumbar condition or pain, as did Dr. Akerson. To the contrary, together these specialists treated or examined Plaintiff, reviewed her lumbar MRIs and thereafter declined to recommend surgery or aggressive treatment, conducted essentially normal or minimally abnormal physical examinations, and/or cleared Plaintiff for work.

Although the specialists' treatment and examinations occurred prior to June 2, 2008, the date Plaintiff alleges she became disabled, their records and opinions are nevertheless relevant to the claims Plaintiff raises in this appeal, as explained next. Plaintiff underwent at least five lumbar MRIs prior to June 2008, the last of which she obtained in April 2007. In May 2007, Dr. Alexander reviewed the April 2007 MRI, as well as Plaintiff's earlier MRIs, and he specifically noted that Plaintiff's condition had not changed significantly since January of 2003; he also stated that Plaintiff's work status remained "full duty." *See* 20 C.F.R. § 404.1527(d)(5) ("more weight [is given] to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."). Although Dr. Alexander's opinions were offered approximately one year prior to Plaintiff's alleged onset date, his opinions nevertheless undermine Dr. Akerson's opinions because there is no evidence showing that Plaintiff's lumbar condition worsened thereafter, including during the time she was under Dr. Akerson's care (i.e., from 2007, forward). To illustrate, Plaintiff obtained no lumbar MRIs or other diagnostic imaging after Dr. Alexander offered his opinions in May 2007; thus, there exists no objective evidence documenting a worsening of Plaintiff's condition. Likewise, Plaintiff obtained no treatment from an orthopedist, neurosurgeon, or other specialist during the time frame relevant to this appeal, as might be expected had her back condition worsened or in any way resulted in the extreme pain and limitations indicated by Dr. Akerson on the forms. Furthermore, no physician opined at any time—much less during the relevant period—that Plaintiff's condition required surgical intervention or a more aggressive course of treatment, and no physician referred Plaintiff to an orthopedist or similar specialist during the relevant period. Rather, during the relevant period Plaintiff mainly obtained treatment from Dr. Evans for pain related to her lumbar condition, and the record reflects that his treatment regimen was successful.

In further discounting Dr. Akerson's conclusory opinions, the ALJ noted that his "own treatment notes" fail to substantiate his opinions (tr. 16, 18). Similarly, the ALJ noted, Dr. Akerson documented no significant "clinical [or] laboratory" abnormalities consistent with the disabling limitations he later imposed (tr. 16). The ALJ's additional reasoning is well-founded and supported by the record. The undersigned has not located—and Plaintiff has not identified—any treatment records from Dr. Akerson that support the opinions at issue here. Indeed, Dr. Francis made the same observation, that is, that Dr. Akerson's treatment notes fail to support his opinions on the SRCs, CAPs, and AFWs. Moreover, Plaintiff admits that "Dr. Akerson's records are somewhat sparse" (doc. 20 at 25). Plaintiff asserts, however, that Dr. Akerson and Dr. Evans coordinated her care, and that Dr. Evans shared his treatment notes with Dr. Akerson; therefore, Plaintiff apparently contends, Dr. Akerson's opinions are based on more than merely his own treatment of Plaintiff, so it matters not that Dr. Akerson's treatment records fail to support his opinions (*see id.* (citing tr. 759)). This argument misses the mark. If Dr. Akerson had been privy to all of Dr. Evans' treatment notes and/or coordinated Plaintiff's care with Dr. Evans, his opinions on the forms are even more inconsistent with the treatment records of which he was aware (i.e., his and Dr. Evans'). As previously noted, and as also noted by the ALJ in discounting Dr. Akerson's opinions, Dr. Evans' records—which include Plaintiff's own reports of only mild to minimal pain and repeatedly reflect successful management of Plaintiff's pain—are wholly inconsistent with Dr. Akerson's opinions (*see* tr. 16–18).[13] Furthermore, regardless of any coordinated care between Dr. Akerson and Dr. Evans, Dr. Akerson remains a family physician who only tangentially treated Plaintiff for her back, did not refer her to a specialist, did not order or review additional MRIs, and did not recommend a different or more aggressive form of treatment, some or all of which actions would be expected if Plaintiff was as limited as Dr. Akerson opined.

Finally, preprinted forms, such as those completed by Dr. Akerson, do not provide persuasive evidence of the validity of the opinions expressed therein, as the ALJ intimated here and as other courts have found. *See, e.g.*, Hammersley v. Astrue, No. 5:08cv245-Oc-10GRJ, 2009 WL 3053707,

---

[13] The ALJ noted, in part, that Plaintiff's "most recent visit to Dr. Evans in March 2010 yielded a pain score of 3/10, which reflects only mild pain and is very inconsistent with the assessment and functional limitations offered by Dr. Akerson" (tr. 17). Numerous other records of Dr. Evans, as summarized *supra*, are similarly inconsistent with Dr. Akerson's opinions.

at *6 (M.D. Fla. Sept. 18, 2009) ("check-off forms . . . have limited probative value because they are conclusory and provide little narrative or insight into the reasons behind the conclusions") (citing Spencer ex rel. Spencer v. Heckler, 765 F.2d 1090, 1094 (11th Cir. 1985) (rejecting opinion from a non-examining physician who merely checked boxes on a form without providing any explanation for his conclusions); Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993) (noting that "[f]orm reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best.")).  For all of these reasons, the ALJ did not err in rejecting Dr. Akerson's opinions.[14]

Dr. Evans

Plaintiff alleges the ALJ erred in his consideration of Dr. Evans' records (doc. 20 at 20, 23). More specifically, Plaintiff contends that "Dr. Evans' records, and the diagnoses he assigned, should have been given substantial—if not controlling—weight, and the ALJ's failure to even address these issues (let alone show good cause for failing to accept this treating source material) mandates reversal for an award of benefits" (doc. 20 at 23, 26).  While her argument is somewhat unclear, Plaintiff appears to assert that the ALJ had an obligation to state "what, if any, weight [he gave to Dr. Evans'] treating source records" and diagnoses—not just his diagnosis of lumbar spondylosis, an impairment the ALJ found severe—and that the ALJ's failure to do so "in and of itself warrants reversal for an award of benefits" (see doc. 20 at 24 (emphasis added) & 26–27).

---

[14] Plaintiff has also raised a related sub-claim, namely, that the ALJ erred in rejecting Dr. Akerson's opinion that she is "incapable of using both hands in fine manipulation" and failing to explain his reason for doing so (doc. 20 at 24–25).  After summarizing Dr. Akerson's opinions on the check-off forms, including the opinion at issue here, the ALJ explained why he was assigning "little weight" to them (tr. 16–17).  Thus, the ALJ did not ignore the opinion as Plaintiff appears to contend.  Even if he had, any error by the ALJ in this regard would be harmless.  Initially, as previously detailed, Dr. Akerson indicated on the most recent SRC that Plaintiff can use both hands in fine manipulation (tr. 749).  Moreover, the record supports this third opinion of Dr. Akerson, not his earlier opinions to the contrary. Although Plaintiff was diagnosed with "severe bilateral carpal tunnel syndrome" by Dr. Evans, as Plaintiff points out in support of this sub-claim (see doc. 20 at 24 (citing tr. 455)), Dr. Evans' diagnosis was rendered in May of 2006, prior to Plaintiff's successful carpal tunnel release surgery in December 2006, and the successful surgery was prior to Plaintiff's alleged onset date of June 2, 2008.  Additionally, records that post-date Plaintiff's successful surgery, but pre-date Dr. Akerson's opinions, clearly reflect that Plaintiff was "doing well" with regard to the CTS (see tr. 285 (Dr. Luarte's opinion); see also, e.g., tr. 286, 557, 560 (normal ranges of motion in—and/or normal examinations of—Plaintiff's upper extremities, hands, and/or thumbs and fingers); tr. 371 (nerve conduction studies performed on February 27, 2008, showed mild neuropathy at the wrist); tr. 558 (Plaintiff reported to Dr. Berliner that she could tie her shoes and button and unbutton her shirts); tr. 559 (Dr. Berliner noted that Plaintiff could hold a pen and write her name without difficulty); tr. 43, 58 (Plaintiff testified she could write notes and use a computer)).  Additionally, after reviewing Plaintiff's medical records, Dr. Francis testified that Plaintiff's CTS is mild.  Stated simply, there is no evidence in the record to support an opinion that Plaintiff cannot use both hands in fine manipulation.

Initially, Plaintiff does not appear to contend that the ALJ erred at step two in failing to find any additional impairments severe, whether diagnosed by Dr. Evans or another physician (*see* doc. 20 at 20–24). Even if Plaintiff has raised such a contention, diagnoses alone are insufficient to establish severity at step two. *See, e.g.*, Salles v. Comm'r. of Social Security, 229 F. App'x 140, 145 (3d Cir. 2007). Plaintiff must present evidence demonstrating that the conditions significantly limited her ability to do basic work activities. *See* 20 C.F.R. §§ 404.1520(c), 404.1521(a); *see also* Salles, 229 F. App'x at 145. Plaintiff has failed to do so, as she has merely recited Dr. Evans' additional, lumbar-related diagnoses, and the court has found no evidence demonstrating that any other diagnosed condition caused significant limitations (*see* doc. 20 at 24). Thus, to the extent Plaintiff has alleged error at step two, she is not entitled to relief.

Next, Plaintiff appears to contend that the ALJ was required to state the weight he assigned to Dr. Evans' records and diagnoses, but Plaintiff is mistaken. Had Dr. Evans offered an opinion as to Plaintiff's functional capacities or pain the ALJ would likely have erred by failing to state the weight he accorded it, but Dr. Evans did not offer any such opinion. Likewise, had the ALJ ignored Dr. Evans' treatment records he would likely have erred, but the ALJ did not ignore his records or diagnoses. The ALJ thoroughly summarized Dr. Evans' records and diagnoses, including the diagnoses Plaintiff suggests he seemingly ignored, such as radiculitis, sacroilitis, degenerative lumbosacral disc, and spinal stenosis of the lumbar region (*compare* tr. 14 *with* doc. 20 at 24; *see also* tr. 15–17, 20–21 (ALJ's continued discussion of Dr. Evans' records)). The ALJ's extensive discussion of the evidence in this case, including Dr. Evans' records, demonstrates that he complied with his obligation to consider Plaintiff's "medical condition as a whole." Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005). An ALJ need not specifically state the weight assigned to records or diagnoses, especially where—as here—the ALJ did not overlook the records or reject an opinion or even a diagnosis of Dr. Evans (the ALJ specifically noted that Dr. Evans did not assess Plaintiff's capacities or pain (*see* tr. 17–18)[15]).

---

[15] Dr. Evans did, however, refer Plaintiff for two FCEs, as the ALJ noted (*see* tr. 13). The FCEs resulted in opinions that Plaintiff could work at light or sedentary-to-light levels of exertions. The results of these FCEs are consistent with the ALJ's overall findings. They also undermine any claim by Plaintiff that Dr. Evans' records support a finding of disability, because the FCEs were conducted at Dr. Evans' request.

Aware that Dr. Evans did not assess her capacities or pain (*see* doc. 20 at 18–19), Plaintiff contends the ALJ had an obligation to consider three notations in Dr. Evans' records stating that Plaintiff's pain behaviors are "within the expected context of disease" and two notations describing Plaintiff's pain as "severe" (doc. 20 at 24 (citing tr. 509, 515, 528, and tr. 519, 538, respectively)). Plaintiff's contention is unpersuasive. First, "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision," as long as the decision "is not a broad rejection which is 'not enough to enable [the district court or this Court] to conclude that [the ALJ] considered her medical condition as a whole.'" Dyer, 395 F.3d at 1211 (quoting Foote, 67 F.3d at 1561). It is clear in this case that ALJ considered the record and Plaintiff's medical condition as a whole. Second, the notations identified by Plaintiff do not undermine the ALJ's findings. The first notation was made on January 10, 2008, when Dr. Evans reported that Plaintiff's last ESI was more than four months prior (tr. 508–09). Noting that the ESIs "helped with [Plaintiff's] ability to perform her activities of daily living, reduce her pain medication requirements, and overall have improved her quality of life"—and that Plaintiff's pain had worsened recently without them—Dr. Evans administered an ESI that day and recommended a future course of ESIs (tr. 508). When Plaintiff returned two weeks later, on January 24, 2008—the same day the second notation identified by Plaintiff was made (*see* tr. 515)—Plaintiff rated her pain as a 3/10 and stated that her current treatment regimen "improved activity, decreased pain, improved quality of life, [and caused] no side effects" (tr. 512, 517). The third notation identified by Plaintiff was made on April 22, 2008 (tr. 528), the same day Plaintiff told Dr. Evans she had recently fallen and landed on her sacrum (tr. 526), which evidently resulted in a temporary exacerbation of her pain (Plaintiff received an ESI approximately one week later, on May 1, 2008, and when she returned for follow-up on July 9, 2008, she rated her pain as a 2/10 and stated she was satisfied with her "current care plan" and desired no change (tr. 535, 538, 541)). Similarly, the notations of "severe" pain identified by Plaintiff essentially reflect occasional exacerbations in Plaintiff's pain, which subsided with Dr. Evans' usual course of care (*see, e.g.*, tr. 519 (notation of severe pain made after Plaintiff reported falling)). The ALJ had no obligation to mention each notation identified by Plaintiff, as he acknowledged that Plaintiff reported fluctuating levels of pain to Dr. Evans (*see, e.g.*, tr. 16–18) but correctly observed that overall Dr. Evans' treatment regimen successfully controlled Plaintiff's pain. As the ALJ

stated—with support in the record—Plaintiff's "own statements to Dr. Evans routinely note that her injective therapy was quite effective in reducing her overall pain" (tr. 17). Based on the foregoing discussion, the undersigned finds no error in the ALJ's consideration of Dr. Evans' records.

Dr. McDowell

Plaintiff presented to Dr. McDowell in late June 2009, more than one year after the date she alleges she became disabled. She returned to Dr. McDowell three times in 2009 and four times in 2010. In July 2010 Dr. McDowell assessed Plaintiff's mental RFC and completed an AFW, as previously discussed. The ALJ considered Dr. McDowell's opinions on these forms and accorded them little weight (tr. 17). The ALJ noted that Dr. McDowell was a treating physician but found that her treatment notes did not support her opinions (*id.*). The ALJ's finding is supported by the record.

Although Dr. McDowell's treatment notes reflect that Plaintiff's affect was sad or her mood depressed, Dr. McDowell's mental status examinations are inconsistent with the extreme limitations she later assessed. The examinations generally revealed that Plaintiff was alert and oriented times four and displayed normal, "fair," or "good" articulation, judgment, fund of knowledge, rate of thinking, thought content, recent memory, remote memory, abstract reasoning, and computation (*see* tr. 678; *see also* tr. 16–17). Additionally, Dr. McDowell observed no loose associations, obsessions, phobias, delusions, or suicidal or homicidal ideations (tr. 678; *see also* tr. 16). Thus, Dr. McDowell's examinations and observations are inconsistent with, for example, her opinions on the RFC assessment that Plaintiff has "marked" limitations in maintaining concentration, persistence or pace; performing simple tasks; and understanding, remembering and carrying out instructions (*see* tr. 736). Dr. McDowell's treatment records likewise provide no support for her opinion that Plaintiff experiences three episodes of decompensation, each of extended duration (i.e., two to three weeks), approximately once every four months. To be sure, Dr. McDowell's records contain no notes reflecting that Plaintiff reported any such episode to her, and there is no indication in her records (or elsewhere in the record) that Plaintiff required hospitalization or intensive therapy as would be expected during the course of one or more of these repeated and lengthy episodes of decompensation. Furthermore, if Plaintiff's mental condition was as debilitating as Dr. McDowell's opinions suggest, Dr. McDowell would likely have altered Plaintiff's medications (as the ALJ noted (tr. 17)), directed that Plaintiff return to see her on a more frequent basis, or recommended more

intensive treatment, but Dr. McDowell took none of these actions (other than once adjusting Plaintiff's dosage of Pristiq). Moreover, Dr. McDowell saw Plaintiff a total of eight times between June 2009 and May 2010—or, on less than a monthly basis—and at Plaintiff's last visit in May 2010, Dr. McDowell advised Plaintiff that she need not return for three months. This treatment plan and visitation schedule are inconsistent with the type and frequency that would be expected for a person who was as limited as Dr. McDowell opined.

Continuing, the ALJ further discounted Dr. McDowell's opinions as inconsistent with the record as a whole (tr. 17). Again, the ALJ did not err. No other examining or treating physician made notations or observations consistent with Dr. McDowell's disabling opinions. Although Dr. Evans and Dr. Akerson occasionally noted that Plaintiff was anxious or depressed, neither referred Plaintiff to a mental health specialist or observed significantly abnormal behaviors or symptoms during the course of their treatment. To the contrary, Dr. Evans often reported that he observed no psychiatric abnormalities. Perhaps more important, Plaintiff had no history of mental health treatment whatsoever prior to her first office visit with Dr. McDowell in June 2009 (and this visit was only in connection with her workers' compensation claim). Although Plaintiff was previously examined by Dr. Horvat (in November 2008) and Dr. Laubenthal (in April 2009), these examinations were in connection with Plaintiff's claim for DIB (Horvat) and workers' compensation (Laubenthal), not to seek or initiate mental health treatment. Additionally, as the ALJ noted, Dr. Horvat concluded there was no psychological reason Plaintiff could not work, and he assessed a GAF indicating only mild symptoms (tr. 15, 18). Dr. Laubenthal did not access Plaintiff's capacities, but Plaintiff contends his records are consistent with Dr. McDowell's opinions (*see* doc. 20 at 26). In support, Plaintiff points to Dr. Laubenthal's observations of Plaintiff's mood and symptoms and to the diagnoses he assessed (doc. 20 at 26). His observations and diagnoses, however, do not alone support the disabling limitations assessed by Dr. McDowell. Moreover, Dr. Laubenthal assessed a GAF that is generally consistent with Dr. Horvat's GAF, as the ALJ noted (tr. 18). Together their GAF scores largely reflect mild symptoms and, correspondingly, undermine Dr. McDowell's opinions (tr. 18). Lastly, Plaintiff had no difficulty understanding, concentrating, or communicating with the ALJ or the Commissioner's employees (*see, e.g.*, tr. 42–67, 187–88), or any of the physicians who treated or examined her, as might be expected if Plaintiff suffered from

the severe limitations assessed by Dr. McDowell.  Thus, the overall record is indeed inconsistent with Dr. McDowell's opinions, as the ALJ found.

The ALJ also noted that Dr. McDowell appeared to focus on Plaintiff's complaints of pain, as opposed to her mental health or limitations (tr. 21).  This finding, too, is supported by the record.  For example, although Dr. McDowell opined on the AFW that Plaintiff would miss work more than three times a month as a result of her impairments, she specifically noted that the impairments to which she referred were Plaintiff's inability "to walk, sit or stand for any length of time" (tr. 738).  Additionally, some of Dr. McDowell's treatment notes suggest that the primary reason for Plaintiff's visit was pain or that the root of Plaintiff's issues was her back pain (*see, e.g.*, 671, 675, 717, 723).

Finally, the ALJ considered that Dr. McDowell's treatment consisted largely of medication management, as opposed to individual therapy (tr. 21), which suggests that Plaintiff's symptoms were reasonably controlled with medication or, similarly, that Dr. McDowell did not believe Plaintiff needed counseling, therapy, or any other additional or more aggressive form of treatment.  Plaintiff argues that this finding—that Dr. McDowell "merely provid[ed] pharmaceutical treatment and not therapy"—is erroneous because Dr. McDowell's treatment notes state, "TREATMENT: Medication evaluation and management; supportive psychotherapy" (doc. 20 at 26 (citing tr. 659, 665, 671)).  Again, Plaintiff's assertion is unavailing.  The "TREATMENT" notations she references are preprinted captions on forms used by Dr. McDowell, and in the spaces provided for handwritten notes that follow the captions there is no indication that Plaintiff actually attended psychotherapy sessions (*see* tr. 659, 665, 671)).  It is evident that these are generic forms used in Dr. McDowell's practice and, further, that the handwritten notations on the forms—not the preprinted captions—are unique to each patient and, correspondingly, constitute the best source of information as to the true nature of a particular patient's care.  Thus, the ALJ did not err in finding that Dr. McDowell primarily, if not exclusively, treated Plaintiff with medication management as opposed to therapy.  In any event, this reason was but one of many offered by the ALJ in discounting Dr. McDowell's opinions, and his other reasons are alone sufficient to uphold his overall findings as to Dr. McDowell.  Thus, in conclusion, the undersigned finds that the ALJ's reasons for discounting Dr. McDowell's opinions are supported by substantial evidence on the record as a whole, and the

reasons were properly considered by the ALJ. Plaintiff, therefore, is not entitled to relief on this claim.

      **B.**      **ALJ's Residual Functional Capacity Determination, and**
      **C.**      **ALJ's Findings at Steps Four and Five**

      Plaintiff contends the ALJ erred in determining her RFC, and in support she raises a variety of sub-claims, including the following: (1) the RFC makes no mention of Plaintiff's CTS "with respect to [Plaintiff's] ability to perform fine manipulation"; (2) the RFC fails to account for the accommodations made by CH "to allow her to continue to work after her 2002 on-the-job injury and until she was fired in 2008"; and (3) the RFC is inconsistent with the disabling opinions offered by Drs. Akerson, Evans, and/or McDowell[16] (*see* doc. 20 at 27, 29–30). In related claims, Plaintiff also contends—based on a variety of arguments—that the ALJ's findings at steps four and five are erroneous.

      Residual functional capacity is an assessment, based upon all of the relevant evidence, of a claimant's remaining ability to do work despite her impairments. *See* <u>Lewis</u>, 125 F.3d at 1440. As stated in 20 C.F.R. § 404.1545(a), it is the most a claimant can still do despite her limitations. "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001). Although the RFC determination is a medical question, it is not based only on "medical" evidence, that is, evidence from medical reports or sources; rather, an ALJ has the duty, at step four, to assess RFC on the basis of all the relevant, credible evidence of record. *See* <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1238 (11th Cir. 2004); <u>McKinney v. Apfel</u>, 228 F.3d 860, 863 (8th Cir. 2000) (the Commissioner must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of her limitations); <u>Dykes v. Apfel</u>, 223 F.3d 865, 866–67 (8th Cir. 2000) (per curiam) (RFC is a determination based upon all the record evidence, but the record must include some medical evidence that supports the RFC finding). *See also* 20 C.F.R. § 404.1545; Social Security Ruling ("SSR") 96-8p (eff. July 2, 1996). Additionally, impairments found non-severe are to be considered in making the RFC determination. 20 C.F.R. § 404.1545(e). But, even when an ALJ finds severe

---

[16] Plaintiff's third claim regarding the opinions of her treating physicians needs no further discussion, as an ALJ need not include in the RFC limitations, restrictions, or opinions he has properly rejected or that are otherwise unsupported by the record. *See* <u>McSwain v. Bowen</u>, 814 F.2d 617, 620 n.1 (11th Cir. 1987).

impairments, it does not necessarily mean there will be functional limitations included in the RFC. *See* McDaniel v. Bowen, 800 F.2d 1026, 1031 (11th Cir. 1986) ("Step two is a threshold inquiry. It allows only claims based on the most trivial impairments to be rejected.").

Plaintiff asserts the ALJ erred by failing to include in the RFC restrictions related to her CTS, an impairment he found severe (*see* tr. 10). Plaintiff, though, has not identified the nature of the limitations she (presumably) contends should have been—but were not—included in the RFC. In support of this claim she points only to Dr. Evans' diagnosis of "*severe* carpal tunnel syndrome" (*see* doc. 20 at 30) (emphasis in original). This diagnosis, however, was made well before the date Plaintiff alleges she became disabled and before her successful carpal tunnel release surgery (*see* footnote 14, *supra*). Furthermore, although the ALJ found Plaintiff's "mild" CTS to be a severe impairment at step two (tr. 10), which corresponds with a finding that it imposes work-related limitations, Plaintiff did not testify that she has any CTS-related limitations (*see* tr. 42–67), and no such limitations are apparent from the record other than lifting and carrying restrictions which are included in the RFC and which are supported by the record. Dr. Francis addressed Plaintiff's CTS, and he specifically opined that the CTS would cause no restrictions in Plaintiff's ability to use her hands, reach in all directions, "handle, finger [or] feel," or perform fine or gross manipulation, as long as she did not lift more than twenty pounds occasionally or ten pounds frequently (tr. 40–42). Thus, the RFC does include restrictions related to Plaintiff's CTS, and Plaintiff is not entitled to relief on this claim.

Next, Plaintiff contends the ALJ erred in finding at step four that she could return to her past relevant work because, according to her testimony, she was able to perform this work only because CH made accommodations for her, such as allowing her to alternate positions at will and take unscheduled breaks (Plaintiff appears to make a similar contention as to the ALJ's alternative finding at step five) (*see* doc. 20 at 27–33). A review of relevant testimony from Plaintiff's hearing is necessary for the resolution of this claim.

Plaintiff testified she could sit or stand at will and take breaks as needed when she worked as an administrative assistant at CH (tr. 45, 64). Robert Strader, a Vocational Expert ("VE"), testified after Plaintiff and noted that prior to the hearing he had reviewed the "vocational aspects" of Plaintiff's file and that he was present for and heard Plaintiff's hearing testimony (tr. 68). He then

testified that he did not need any additional information as to Plaintiff's past work in order to offer expert opinions (*see* tr. 69–70).  He proceeded to characterize Plaintiff's original work at CH as a health aide, which was performed at a medium exertional level, and her more recent administrative work at CH as a "general clerk," which is normally performed at a light exertional level but was performed by Plaintiff between the light and sedentary exertional levels (tr. 70).  The ALJ then asked the VE to assume a hypothetical individual with, in pertinent part, Plaintiff's past work experience "who's confined to the performance of a relatively full range of light work as that's defined in the regulations [and] [w]ith only a preclusion from working at unprotected heights," and whether such an individual could perform Plaintiff's past work as a general clerk (tr. 70).  The VE responded that such a person could perform Plaintiff's past work as a general clerk <u>and</u> other available work, including work as a ticket taker (light), gate guard (light), hand packer (light), and food and beverage order clerk (sedentary) (*see* tr. 70–72).  The VE further opined that the ticket taker, gate guard, food and beverage clerk, and general office clerk jobs could still be performed even if the requirement of "ability to alternate between sitting and standing" was added to the hypothetical question (tr. 72).  The VE noted that the available job base for a ticket taker would likely be reduced with the additional requirement, but any reduction would be offset by the available number of parking lot cashier positions, another light job that the hypothetical individual could perform (with the requirement of alternating between sitting and standing) (tr. 71–72).  Finally, the VE testified that to the extent any differences existed between the way the jobs he identified are performed and the way they are described in the Dictionary of Occupational Titles ("DOT"), he stood by his earlier testimony that the jobs he identified could be performed even if a sit/stand option is required (tr. 73–74).

It is abundantly clear from VE Strader's testimony that the ALJ's findings at step four and step five are not undermined by Plaintiff's need to alternate between sitting and standing.  The VE's testimony unequivocally establishes that Plaintiff can perform either her past relevant work or other available work if she needs to alternate between sitting and standing.

As to Plaintiff's testimony that she took breaks as needed when she worked for CH, and the ALJ's failure to include this additional limitation in the hypothetical question(s), the undersigned finds no error at either step four or step five.  First, it is far from clear that Plaintiff actually needed

to take breaks in order to work. Plaintiff made no mention of this requirement when she previously described her job at CH (*see, e.g.*, tr. 192, 251). Moreover, during her testimony she merely stated she was allowed to take breaks as needed at CH[17] (tr. 45). She did not describe the nature of the breaks, such as their length or frequency, and she did not offer any other details regarding the breaks (*see* tr. 45). Additionally, Plaintiff subsequently testified that after she was fired she looked for jobs that were similar to her work at CH, such as jobs in nursing homes, convenience stores, and grocery stores, and she specifically noted that she looked for those jobs because they would allow her to "get up and down as needed" and work at her "pace," which she described as not having "to stand all day or sit all day" (tr. 49). Plaintiff did not state that she further limited her search to jobs that would accommodate a need for breaks (*see id.*). Even though Plaintiff later testified in response to a leading question by her representative—without any explanation or elaboration—that both accommodations were necessary (*see* tr. 64), Plaintiff's testimony as a whole may reasonably be construed as indicating that she could work with only one accommodation (that is, the ability to alternate between sitting and standing). The ALJ's finding at step four is therefore consistent the foregoing testimony. It is also consistent with Plaintiff additional testimony that she would have continued working at CH had she not been fired, and that prior to being fired she intended to continue working there and considered the job a permanent position.

Likewise, the ALJ did not err in making his alternative finding at step five. First, as previously noted, the VE testified that he had reviewed Plaintiff's vocational history, heard Plaintiff's testimony, and needed no additional information in order to provide his expert opinions. Coleman v. Astrue, 269 F. App'x 596, 600 (7th Cir. 2008) ("Hypothetical questions posed to vocational experts ordinarily must include all limitations supported by medical evidence in the record. . . . However, an incomplete hypothetical may be cured and the omitted limitations imputed to the vocational expert where the expert independently reviewed the record and was present during the hearing.") (citing Young v. Barnhart, 362 F.3d 995, 1003 (7th Cir. 2004)). Thus, even if Plaintiff's need for breaks is supported by the evidence of record, the ALJ's failure to include this limitation in hypothetical was cured by the VE's knowledge of the record and presence during

---

[17] The alleged need appears in the lengthy record only once (that is, its brief mention during Plaintiff's testimony).

Plaintiff's testimony. Second, Plaintiff's representative was provided with an opportunity to question the VE about any matter, including a need by Plaintiff to take breaks, but he did not ask the VE to consider this alleged need or whether it would affect his opinions as to Plaintiff's ability to work (*see* tr. 75). Third, Plaintiff continually sought work after she was fired, including during the time she received unemployment benefits when she was required to do so, and after her unemployment benefits ended when she was not required to do so. Her search for work, in places such as nursing homes, convenience stores, and grocery stores, is consistent with the ALJ's finding at step five that Plaintiff could perform other types of work. Similarly, Plaintiff's desire or intention to return to work is inconsistent with disability and indicates she did not view her limitations as disabling. *See* Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995); Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994) (claimant's statements that he was seeking work are inconsistent with disability).

In sum, by offering a clear hypothetical question that included "nearly all"—if not all—of Plaintiff's limitations, "the ALJ allowed [the VE] an opportunity to absorb all of [her] relevant limitations through a mixture of the hypothetical, the medical evidence in the record, and the hearing testimony." Coleman, 269 F. App'x at 601 (citation omitted). The ALJ then properly relied on the VE's testimony in making his alternative finding of "not disabled" at step five. *See* Phillips v. Barnhart, 357 F.3d 1232, 1240 (11th Cir. 2004) ("A vocational expert is an expert on the kinds of jobs an individual can perform based on his or her capacity and impairments.").

Plaintiff's remaining claims as to the ALJ's findings may be summarized as follows: (a) the ALJ erred in failing to include in the hypothetical question the frequency in which Plaintiff would need to alternate between sitting and standing, citing SSR 96-9p; (b) the ALJ erred by including in the hypothetical question an ability to perform "a relatively full range of light work"; (c) the VE's testimony is inconsistent with the DOT; and (d) the ALJ failed to comply with SSR 00-4p and SSR 83-12 (both of which concern an ALJ's reliance on VE testimony at step five) (doc. 20 at 20, 29–30). These claims may be disposed of with little discussion.

All of the claims concern the VE's testimony in general and his testimony in response to the ALJ's hypothetical questions. The ALJ, however, did not need the VE's testimony at step four to conclude that Plaintiff could perform her past relevant work. Lamb v. Bowen, 847 F.2d 698, 704

(11th Cir. 1988) (citing Schnorr v. Bowen, 816 F.2d 578 (11th Cir. 1987); Chester v. Bowen, 792 F.2d 129 (11th Cir. 1986)); *see also* Feist v. Astrue, No. 2:08cv454/TFM, 2009 WL 3275614, at *6 (M.D. Ala. Oct. 13, 2009). Thus, even if the claims have merit—a finding the undersigned does not make—they do not undermine the ALJ's finding that Plaintiff can perform her past relevant work (a finding which in this case is bolstered by the VE's testimony, even though the testimony was not necessary at step four).

Although the claims could impact the ALJ's findings at step five (if they have merit), any error at step five would be harmless because the ALJ's ultimate conclusion of "not disabled" may be upheld based on his finding at step four. *See, e.g.*, Ehrisman v. Astrue, 377 F. App'x 917, 920 (11th Cir. 2010) (because the ALJ found the claimant not disabled at step four of the sequential evaluation, and the ALJ did not err at step four, there is no need to address her claim of error at step five). Plaintiff, therefore, is not entitled to relief.

Finally, it should be emphasized that in determining Plaintiff's RFC, the ALJ assigned great weight to the opinions of Dr. Francis, a board certified orthopedic surgeon (tr. 19). The ALJ did not err in doing so. Dr. Francis testified that he had reviewed Plaintiff's entire file, and he opined that Plaintiff could perform light work but should be restricted from working at unprotected heights. The RFC determined by the ALJ is thus wholly consistent with the opinion of a medical expert, who based his opinion on a review of Plaintiff's entire medical history.[18] Therefore, the ALJ's findings at step four and step five, which are based on the RFC, are well supported by the record and should not be disturbed.

D.      Plaintiff's Credibility

Plaintiff contends the ALJ erred in discounting her subjective complaints of pain and other symptoms (doc. 20 at 20, 33–35). As this court is well aware, pain and other subjective complaints are treated by the Regulations as symptoms of disability. Title 20 C.F.R. § 404.1529 provides in

---

[18] The ALJ also assigned substantial weight to the opinions of Dr. Fitzgerald, who examined Plaintiff in 2003 and twice opined that Plaintiff could perform light duty work (*see* tr. 12, 14). Plaintiff asserts error in this regard, noting that Dr. Fitzgerald's opinions were offered prior to the date she alleges she became disabled (doc. 20 at 17–18, 22, 27). To the extent error exists, it is harmless. Dr. Fitzgerald's opinions are fully consistent with the more recent opinions of Dr. Dawson and Dr. Francis, upon which the ALJ relied on—in part—in finding Plaintiff "not disabled." Dr. Fitzgerald's opinions are also consistent with the record as a whole, including the opinions of other specialists, the results of Plaintiff's MRIs, and the results of multiple physical examinations.

part that the Commissioner will not find disability based on symptoms, including pain alone, "unless medical signs or findings show that there is a medical condition that could be reasonably expected to produce these symptoms." The Eleventh Circuit has articulated a three-part pain standard, sometimes referred to as the <u>Hand</u> test, as follows:

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.

<u>Hand v. Heckler</u>, 761 F.2d 1545, 1548 (11th Cir. 1986) (originally adopting the three-part pain standard). The Eleventh Circuit continues to follow the <u>Hand</u> test. <u>Wilson v. Barnhart</u>, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing <u>Holt v. Sullivan</u>, 921 F.2d 1221, 1223 (11th Cir. 1991); <u>Ogranaja v. Commissioner of Social Security</u>, 186 F. App'x 848, 2006 WL 1526062, at *3 (11th Cir. June 5, 2006) (quoting <u>Wilson</u>); <u>Elam v. Railroad Retirement Bd.</u>, 921 F.2d 1210, 1216 (11th Cir. 1991).

Underlying the <u>Hand</u> standard is the need for a credibility determination concerning a plaintiff's complaints. Those complaints are, after all, subjective. "[T]he ascertainment of the existence of an actual disability depend[s] on determining the truth and reliability of [a claimant's] complaints of subjective pain [or other symptom]." <u>Scharlow v. Schweiker</u>, 655 F.2d 645, 649 (5th Cir. Sept. 1981) (holding that the ALJ must resolve "the crucial subsidiary fact of the truthfulness of subjective symptoms and complaints").[19] People with objectively identical conditions can experience significantly different levels of pain, and pain is more readily treated in some than in others. "Reasonable minds may differ as to whether objective medical impairments could reasonably be expected to produce [the claimed symptom]. This determination is a question of fact which, like all factual findings by the [Commissioner], is subject only to limited review in the courts to ensure that the finding is supported by substantial evidence." <u>Hand</u>, 761 F.2d at 1548–49. It is within the ALJ's "realm of judging" to determine whether "the quantum of [symptoms a claimant] allege[s] [is] credible when considered in the light of other evidence." <u>Arnold v. Heckler</u>, 732 F.2d 881, 884 (11th Cir. 1984). The evidence as a whole, including the existence of corroborating

---

[19] Decisions of the United States Court of Appeals for the Fifth Circuit decided on or before September 30, 1981 are binding precedent in the Eleventh Circuit. <u>Bonner v. Pritchard</u>, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

objective proof or the lack thereof, and not just a physician's belief or the plaintiff's claims, is the basis for the ALJ's credibility determination.

Here, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause some of her alleged symptoms, but he concluded that her statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the RFC (tr. 20). In support of this credibility finding, the ALJ articulated numerous reasons, including the following: (1) Plaintiff's daily activities are inconsistent with disabling limitations (and consistent with the RFC determination); (2) Plaintiff's treatment "has been essentially routine and/or conservative in nature"; (3) Plaintiff's medications and "injective therapy" have effectively controlled her symptoms; (4) Dr. Alexander, "a treating orthopedist," and Dr. Rohan opined that Plaintiff could work full time at the light duty level; (5) objective tests, including lumbar MRIs and a whole body bone scan, did not reveal significant abnormalities as would be expected if Plaintiff was as limited as she alleged; (6) physical examinations, including FCEs and musculoskeletal and neurological examinations, resulted in opinions that Plaintiff could perform full time light duty work or, similarly, revealed no significant abnormalities consistent with Plaintiff's complaints; (7) Dr. Evans' progress notes from the time frame relevant to this appeal do not support Plaintiff's "subjective complaints of severe and debilitating pain"; (8) Plaintiff displayed none of the typical signs to support a diagnosis of radiculopathy; (9) Dr. Horvat found evidence of only a mild adjustment disorder, assessed a GAF of 65, and indicated that there was no psychological Plaintiff could not work; (10) Dr. McDowell's treatment notes do not substantiate complaints of disabling mental limitations, nor do the GAF scores of record; (11) Plaintiff's allegedly disabling physical impairments were present at approximately the same level of severity prior to the alleged onset date, and the "fact that the impairments did not prevent the claimant from working at that time strongly suggests that [they] would not currently prevent work," especially considering that Plaintiff "stopped working for reasons not related to the allegedly disabling impairments"; (12) Plaintiff received unemployment compensation benefits from the fourth quarter of 2008 through the spring of 2010, and by "receiving these benefits, [Plaintiff] acknowledge[d] that she [was] willing, ready and able to work"; (13) Plaintiff's description of her symptoms and limitations, "provided throughout the record," have generally been inconsistent and unpersuasive; (14) Plaintiff's

"portrayed no evidence of pain or discomfort" during her hearing (the ALJ emphasized that the fourteenth factor was "only one among many being relied on in reaching a conclusion regarding the credibility of [Plaintiff's] allegations" and noted that although Plaintiff's "hearing was short-lived and cannot be considered a conclusive indicator of the [her] overall level of pain on a day-to-day basis, the apparent lack of discomfort during the hearing is given some slight weight in reaching the conclusion regarding her credibility . . . ."); and (15) the opinions of Dr. Guttman, Dr. Dawson, Dr. Conger, and Dr. Meyers are inconsistent with Plaintiff's complaints of disabling limitations, as together these physicians concluded that Plaintiff could perform light to medium work and that her mental impairments are non-severe (the ALJ noted that although these physicians did not examine Plaintiff, "and therefore their opinions do not as a general matter deserve as much weight as those of examining or treating physicians," their opinions are entitled so "some weight, particularly in a case like this in which there exist a number of other reasons to reach similar conclusions") (tr. 20–22).

Plaintiff contends that four of the foregoing credibility findings were made in error, specifically, findings (as numbered by the undersigned) one (daily activities), two (routine and conservative treatment), seven (Dr. Evans' treatment records), and fourteen (Plaintiff's appearance and demeanor at the hearing) (*see* doc. 20 at 33–35).

Initially, even if these four finding were made in error, the ALJ's eleven other stated reasons for finding her less than fully credible would alone be sufficient to uphold his overall credibility findings. The four findings, however, were not made in error. As to finding number one, although Plaintiff testified she could perform only minimal daily activities, at other times she stated she could perform significantly greater activities. For example, during the time frame relevant to this appeal Plaintiff reported staying with her daughter and taking care of her daughter's baby (*see* footnote 7, *supra*), and she told Dr. McDowell that she loved yard work, she picked up and babysat her nieces (aged thirteen and nine), and she cared for her twin, four-year-old grandchildren. Therefore, the ALJ did not err in concluding that Plaintiff was not as limited as she testified. As to findings numbered two and seven, no further discussion is warranted, as Plaintiff asserted essentially the same arguments in support of earlier claims, and the undersigned has previously determined that those claims are without merit. And, as to finding number fourteen, as the ALJ clearly acknowledged, he

could not rely on Plaintiff's appearance alone in support of his credibility findings, and he did not do so. Thus, he did not err. *See* <u>Schnorr</u>, 816 F.2d at 582 ("The Secretary relied on substantial evidence, including demeanor evidence, to conclude that [the claimant's] complaints were not credible."); <u>Macia v. Bowen</u>, 829 F.2d 1009, 1011 (11th Cir. 1987) ("The ALJ is not prohibited 'from considering the claimant's appearance and demeanor during the hearing.'") (quoting <u>Norris v. Heckler</u>, 760 F.2d 1154, 1158 (11th Cir. 1985)); *see also* <u>Villa v. Sullivan</u>, 895 F.2d 1019, 1024 (5th Cir. 1990) (exclusive reliance on demeanor in credibility determinations is inappropriate, but it is not reversible error to consider demeanor as one of several factors in evaluating credibility); SSR 96-7p (eff. July 2, 1996) (an ALJ is permitted to "consider his or her own recorded observations of the individual as part of the overall evaluation of the credibility of the individual's statements").

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed. 42 U.S.C. § 405(g); <u>Lewis</u>, 125 F. 3d at 1439; <u>Foote</u>, 67 F.3d at1560. Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED,** and that the clerk be directed to close the file.

At Pensacola, Florida this <u>11</u>[th] day of February 2013.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


<u>**NOTICE TO THE PARTIES**</u>

**Any objections to these proposed recommendations must be filed within fourteen (14) days after being served a copy hereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>. A copy of any objections shall be served upon any other parties. Failure to object may limit the scope of appellate review of factual findings. *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**